Gerz's Exrx. *v.* Demarra's Exrs. (Weber at al.), Appellants.

*Decedent's estates—Claim for services—Evidence—Presumption.*

Relationship, either by consanguinity or affinity, is a fact which tends to rebut the presumption, which the law raises, that a promise to pay is intended when personal services are rendered. But, alone, it does not overcome the presumption except in the case of parent and child. In all other cases there must be evidence beyond the relationship that the creation of no debt was intended.

In an action by a son-in-law against his mother-in-law's estate for board, where one of the witnesses testifies that the decedent had told her that she had promised to pay her son-in-law for board, the case must be submitted to the jury.

Argued May 14, 1894. Appeal, No. 19, Jan T., 1894, by defendants, Otto Weber et al., executors of Theresa Demarra, deceased, from judgment of C. P. Lancaster Co., Feb. T., 1890,

No. 33, on verdict for plaintiff, Rosalie Gerz, executrix of J. W. Gerz, deceased.   Before STERRETT, C. J., WILLIAMS, MC-COLLUM, MITCHELL and FELL, JJ.   Affirmed.

Assumpsit for board and services.   Before BRUBAKER, J.

The facts of the case appear by the charge of the court, which was in part as follows:

" [On the part of the plaintiff they have endeavored—and it is for you to say how successful they have been, and I will be obliged to leave it to you as a question of fact in this case—on the part of the plaintiff, as I say, they have endeavored to prove to you, that there was an agreement between these parties for the board, lodging and services rendered to the decedent, Theresa Demarra.]   [2] . . . .

" [ The proof of such agreement, however, cannot be made by loose declarations of the decedent, nor is the expression of an intention on the part of the decedent to compensate, evidence of an agreement; but an admission by the decedent that there was an agreement or promise made to the claimant to pay for board and services, would be sufficient obligation on her part capable of being enforced against her.   Is there any evidence of an agreement to compensate for board and services in the case now before us, is the main question raised in the suit here.   Had not the plaintiff produced one witness, upon whose testimony this case, in the mind of the court, hinges, as to the contract or the existence of the contract, that of Miss Annie Haberbush, a native of Alsace, Germany (the territory about which there was so much trouble, and which was taken from France in the war of 1870), and who has resided here for some time, I would have been obliged to have given you binding instructions to render a verdict in favor of the defendant, as requested by the counsel for the defendant, in a point presented to me, to so charge you.]   [3]

" [But in the latter part of her testimony, which I shall now read to you from the transcript of the stenographer's notes, so that you may catch it and remember it, there is, in the opinion of the court, some evidence of an agreement to compensate or to pay her son-in-law for boarding and services sufficient to support a recovery in this case.   You will remember that when this case was tried before, her deposition was taken before

alderman Barr, in the city, just a day or two prior to her visit or return to Alsace, Germany. She was not produced upon the witness stand here at that time. Her evidence was not given before the court and the jury in person. It was brought here in writing, as I say, by her deposition. At this trial she has been produced upon the witness stand. You have seen her. She has been sitting here in court all the week, and you saw her on the stand. She is apparently a woman of intelligence, a young woman about twenty-five years of age, who felt more at home in the use of her own languages, those of France and Germany, than in English. It appears also that Theresa Demarra was a French woman; that her native language was French; and that this witness, Miss Haberbush, was intimately acquainted with her, in fact, she had slept with her, and she had talked with her frequently in French, and that the conversations she had with her were in French. In the latter part of this testimony, to which I will draw your attention, and particularly when she was severely cross-examined as to what she had said with reference to her promise to pay, she said she didn't understand the English language right. I, then, in order to get at the justice of the case, interpolated myself a question, and asked the court interpreter, when she manifested that she could tell it better in German, to propound the question in German, and it was answered in German, and that is the latter part of her testimony, to which I want you to pay attention. I shall read so much of it as refers to the contract. In the direct examination she was asked this question: ' Q. Did you ever have any conversation with her about how she was stopping or boarding there? A. Oh, yes. She was treated well there. Q. Did she ever say anything about her going to pay Mrs. Gerz? A. Yes. She said to me that Rosa was always the best; and she said, one of these days she was going to pay Rosa well, she said always to me.' I say to you, that would not be a contract.

" ' Who was Rosa? A. Mrs. Gerz. Q. You say she had diarrhœa? A. Yes sir. All the time; and many a time I saw for myself when I got up in the night time—I was there and slept with her.'

" By the Court: Then upon cross-examination she said: ' Q. You were examined in this case before? A. Yes sir.

Q. Your deposition was taken, and you testified before the squire in this case before? A. Yes sir. Q. You testified then that the old lady said, when she died she would pay Rosa well? A. Yes sir. Q. Was that the exact language that she used? Is that exactly what she said? A. Yes sir. Q. Those were the words? A. Yes. I wouldn't swear false. Q. She said when she died she would pay Rosa well? A. Yes sir. Q. Where did she say that? She said it to me. Q. You and she would talk together? A. Yes sir. Q. You are sure those are the very words that she used, that when she died she would pay Rosa well? A. Yes sir. Q. She said nothing more or nothing less? That is what she said? A. Yes sir. Q. By Mr. Davis: What did she say she was going to pay Rosa for? A. She promised for the trouble and everything.'

"Now if the matter had stopped there, I should have been obliged to instruct you to find in favor of the defendant, because there had been no evidence of a contract. It would be merely an expression of an intention, and it would not be sufficiently clear to allow that evidence to be submitted to you for your consideration. But in the latter part of the cross-examination Mr. Snyder took up the subject again; after which she was asked by Mr. Brown, as follows: 'Q. You say, she promised you that she would pay Rosa? A. Yes. She said to me. Q. Promised you? A. Yes sir. By the Court: Did she ever say that she was to pay board? A. Yes sir. She said to me that she was treated well in her place, and one of these days she wanted to pay her well for her boarding, for her trouble. Q. Did she say she was to pay it? A. Yes. She wants to pay it. Q. Did she say who was to pay it? A. Yes. She wants to pay it. Q. Did she say who was to pay it? A. She said she had promised to pay it, for her trouble and for her board. By the Court: Did she say that she promised them or you? A. Yes. She promised me. By the Court: That she would pay for the board? A. Yes sir. And all for her trouble. Q. Did she say she had promised them? A. Yes. Them.' Now the question is, what she meant by this word 'promised.' You frequently find that people from the old country, especially the French and some Germans, use words in a different sense from our own people. It is for you to say what she meant when she said, 'Yes. She promised me.' That is a question

for you, and I simply draw your attention to it.  You are familiar with our own Lancaster county Dutch and you know how they talk, and you know that they very frequently use odd language in expressing their ideas.

" 'By the Court : Did she say to you she had told them she would pay them ?  A. Yes sir.  I can't understand it in English right.  I could say it better in German.  By the Court : Let the court interpreter put the last question to the witness in German. (Question by the interpreter in German.)  Q. Did she say to you (in German), she had told them she would pay them?  A. Yes. She had always said to me she told them she promised to pay them for her board and her trouble.  By the Court : Was this in German or French ?  A. French.  By Mr. Brown : You never heard the old woman say anything to them ?  This conversation was to you.  Was this conversation addressed to her?  A. They were all sitting together.  Sometimes she said it to me ; sometimes they were all together when she said it.  By the Court : Who do you mean by " they ? "  A. Mrs. Goodhart and Mrs. Gerz and Mr. Gerz, her son-in-law.'  That was her testimony.] [4]

" [The court is not disposed to take the testimony from you under the circumstances, nor the fact whether the language given by her in English or in German shows that there was a promise, an express promise or intention on the part of the decedent to pay for the board furnished and the services rendered in this case.  I mean by ' intention ' an intention of the parties, no matter what the opinion of the court may be.  It is solely a fact to be found by you.] [5]

" [Now, the question for your consideration is, whether the admissions, as testified to you by the witness, Miss Haberbush, were clear and positive admissions of an agreement existing between them to compensate for the board furnished and the services rendered in this case.  It is true, we have not, as the courts have said in some cases, the precise terms of the agreement here—how much it was to be, nor when it was to be paid ; but we have her evidence as to what it was to be paid for, and about what the contract was, if you believe and give credence to that one witness.  Outside of that one witness there would be no evidence at all before you to enable you to find that fact.] " [6]

Verdict and judgment for plaintiff.

*Errors assigned* were (1) refusal of binding instructions for defendants; (2–6) instructions as above, quoting them.

*J. E. Snyder* and *J. Hay Brown,* for appellant, cited: Neel's Adm. v. Neel, 59 Pa. 347; Zimmerman v. Zimmerman, 129 Pa. 237; Barhite's Ap., 126 Pa. 409; Leidig v. Coover's Executors, 47 Pa. 534; Mosteller's Ap., 30 Pa. 473; Lynn v. Lynn, 29 Pa. 369; Houck v. Houck, 99 Pa. 554; Patton v. Conn, 114 Pa. 186; Ulrich v. Arnold, 120 Pa. 170; Duffey v. Duffey, 44 Pa. 399; Horton's Ap., 94 Pa. 62; Miller's Ap., 100 Pa. 571; Moyer's Ap., 112 Pa. 290; Curry v. Curry, 114 Pa. 371; McConnell's Ap., 97 Pa. 31; Carpenter v. Hays, 153 Pa. 432; McHenry's Ap., 148 Pa. 575; Hertzog v. Hertzog, 29 Pa. 465; Wall's Ap., 111 Pa. 460.

*Benjamin F. Davis,* for appellee, cited: Perkins v. Hasbrouck, 555 Pa. 494; Smith v. Milligan, 43 Pa. 107; Miller's Ap., 100 Pa. 568; Webb's Est., 7 Lanc. L. R. 105.

PER CURIAM, July 11, 1894:

Suit was brought by J. W. Gerz against the executors of his mother-in-law, Theresa Demarra, for boarding, etc., while she was an inmate of his family from 1887 to 1889. The first trial resulted in a verdict and judgment for plaintiff; but on appeal to this court the judgment was reversed and a new trial awarded because of the erroneous rejection of testimony tending to prove payment, etc.: Gerz v. Weber et al., 151 Pa. 396. Plaintiff in the meantime died and his executrix was substituted on the record. None of the reasons that formerly moved us to reverse the judgment appear to exist now. None of the witnesses who were then produced to prove the allegations of fact recited in the rejected offers were called at the last trial. Instead of attempting to prove payment as before, defendants appear to have relied mainly on the alleged weakness of plaintiff's case. It was clearly shown, however, that during the time Mrs. Demarra resided with her son-in-law she was well provided with everything that was necessary to her comfort. There was also testimony tending to prove a mutual under-

standing or agreement between them that she would pay for her boarding, etc. This testimony, referred to by the learned trial judge in portions of his charge recited in the second to the sixth specifications inclusive, was submitted to the jury with instructions which appear to be free from substantial error. While said testimony is not as clear and positive as it might have been, it was quite sufficient, in connection with other evidence, to justify the court in submitting the question to the jury : Miller's Appeal, 100 Pa. 568. The necessary implication from their verdict is that the existence of such agreement, as a fact, was found by them. That being so, there is nothing that requires reversal of the judgment. Clearly there was no error in refusing to charge as complained of in the first specification, that " under the law and the evidence in this case the verdict must be for defendants ; " and we have already intimated that there is nothing in the remaining five specifications that requires any such action.

In view of the relationship of the parties to the transaction, we think the court held the plaintiff to a sufficiently rigid rule of proof. " Undoubtedly," said Mr. Justice STRONG in a somewhat similar case, Smith v. Milligan, 43 Pa. 107, " relationship, either by consanguinity or affinity, is a fact which tends to rebut the presumption which the law raises, that a promise to pay is intended when personal services are rendered. But, alone, it does not overcome the presumption except in the case of parent and child. In all other cases, there must be evidence beyond the relationship that the creation of no debt was intended." To the same effect is Perkins v. Hasbrouck, 155 Pa. 494.

Judgment affirmed.