## Mensch Estate

*C. Edmunds Wells* and *Thomas W. Leidy*, for accountant.

*Joseph K. Fornance*, for claimant and objector.

TAXIS, P. J., October 31, 1957.—The first and final account of Raymond K. Mensch, executor, was examined and audited by the court on February 27, 1957. . . .

The remaining objections of the Reconstruction Finance Corporation relate to the payment by the executor of claims presented by Evelyn Binder, hereinafter referred to as Evelyn, in the amount of $800 for services to decedent such as "washing, giving medicine, changing diapers, helping him in and out of

bed, preparing and serving meals," and William C. Binder, hereinafter referred to as William, in the amount of $7,879.77 primarily for office rent, board, lodging and practical nursing services. The bulk of the latter claim is itemized as follows:

"Jan. 1st 1946 To April 23rd 1955

"To furnishing Office space, heat, light and cleaning

"484 weeks at $5.00 per week ..........$2420.00

"Jan. 1st. 1946 To Jan. 1st. 1949

"To furnishing room and board at 3 meals per day, including washing and ironing.

"156 weeks at $5.00 per week ..........$ 780.00

"Jan. 1st. 1949 To Jan. 1st. 1953

"To furnishing room and board at 3 meals per day, including extra washing and ironing, and cleaning due to physical conditions,

"208 weeks at $10.00 per week ..........$2080.00

"Jan. 1st 1953 To April 23rd 1955

"To furnishing room and board at 3 meals per day, including extra washing and ironing, and extra work in cleaning due to physical conditions becoming more serious,

"120 weeks at $15.00 per week ..........$1800.00

Total ..........................  $7080.00"

On February 19, 1957, the depositions of the executor were taken at his beside at the Valley Forge Heart Hospital. At the audit the testimony of claimant William was heard, and the depositions along with exhibits E-1 and E-2 containing an itemization of the claims presented to the executor were admitted into evidence. On the basis of this record the following facts were established.

Ammon B. Mensch, decedent, died on April 23, 1955, at the age of 89. He was a widower at the time of his death and was survived by five children, a daughter,

Mazie Binder (wife of claimant William), and four sons, Raymond K. Mensch, (the executor), Newton K. Mensch, Allen K. Mensch and Arthur Mensch. For a 15-year period prior to his death decedent had lived at the home of his daughter and son-in-law, Mazie and William. By occupation decedent served the community as a justic of the peace and also dealt to a limited extent in real estate and insurance. He carried on his business from a room on the first floor of the Binder's house, "the nicest room in the whole house" which he used as an office. In addition he occupied a room upstairs as his living quarters. During the period of his residence in the Binder household his daughter prepared all his meals and did all his washing, ironing and cleaning.

From January 1, 1949, until his death, decedent suffered from an undefined illness vaguely diagnosed as "old age." His personal physician, Dr. Charles Dotterer, died two or three weeks prior to the audit and was not available to elaborate on the particular type of illness afflicting decedent. However, it was established that decedent underwent surgery on his prostate gland in 1948 and again in 1952. Following the latter operation decedent became completely bedfast and was unable to control his kidney or his bowels. Consequently during the last two years of his terminal illness decedent required 24-hour a day personal supervision. At the suggestion of his physician a type of diaper was procured, and during the last three months of decedent's life, it was necessary to change the diaper approximately every hour. This distasteful and unpleasant task was performed by claimants, Evelyn and William, and also by the latter's wife, Mazie Binder. Evelyn is the wife of the son of Mazie and William, i.e., is married to the grandson of decedent, has one son age 11, and resides about a mile from decedent's residence.

The routine of caring for decedent during the last two years of his life was roughly as follows: Evelyn would arrive about nine o'clock after seeing her son off to school. She and Mazie Binder would attend to decedent during the day. William was employed during the day by the Bethlehem Steel Company in Pottstown. Upon his return his first task was to burn, at doctor's orders, the accumulation of diapers used during the day. During the evening all three parties pitched in to attend to decedent.

The claim presented by Evelyn reads as follows:

"Jan. 17th 1955 To April 27th 1955

"100 days, ranging from 12 to 14 hrs per day to services such as, Washing, Giving medicine, Changing Diapers, helping in and out of bed, preparing and serving meals.

"$8.00 per day ..................... $800.00"

Although it was established that claimant provided certain services sporadically during the last two years of decedent's life, her claim covers a period of only the last three months. It was explained that her services were not provided on a daily basis until the beginning of the period stated in the claim.

The law relating to claims for services rendered a decedent was clearly enunciated in Gibb's Estate, 266 Pa. 485, at page 487, as follows:

"Ordinarily, an implied promise exists to pay for services rendered and accepted, and the burden is on the person denying liability to show no debt was, in fact, intended. This rule does not apply, however, where the services are rendered by members of a family to each other, as such services are usually performed without expectation of remuneration [citing]; consequently, where the family relation exists no action can be maintained for services of the kind here claimed, unless an express promise or agreement to pay is proven. In other words, the existence of the family

relationship rebuts the presumption which the law would otherwise raise that there was a promise to pay. Relationship alone, however, is sufficient to overcome the presumption only in the case of parent and child [citing]. *In other cases the burden is on the person denying liability to show no debt was, in fact, intended.* It has been held that no presumption of family relationship existed where the claim was by a son-in-law against his father-in-law for board. . . ." (Italics supplied).

As to the claim of Evelyn, it is clear that the existence of an express promise to pay for her services was not established. Although decedent in his lifetime indicated on various occasions to his son, the executor, and to others, his appreciation and gratitude for the care which he received from Evelyn, and expressed the wish that she be compensated for her services, there was absolutely no contract or agreement of any kind between them with regard to payment of compensation. The following colloquy appears in the depositions at page 10:

"Q. Mr. Mensch, to your knowledge, was there any agreement of any kind existing between your father and Evelyn Binder concerning the services that Evelyn Binder was doing for him?

"A. Just verbal. My father told me lots of times how good Evelyn Binder was to him, and he said he wouldn't get any better attention from a nurse.

"Q. With reference to any agreement, was any agreement made concerning payment for Evelyn Binder's services?

"A. No. I don't know if there was any agreement. I don't believe any agreement was ever made."

Although no express promise to pay was established, it seems clear in the present case that Evelyn has established the performance of services, and the law will imply a promise on the part of decedent to pay

for same. Objector has argued that it was demonstrated that a family relationship existed between claimant and decedent, and that therefore no promise to pay can be implied. However, I am not persuaded that objector has met the burden placed on the person denying liability to show that no debt was, in fact, intended. In the first place, it is undisputed that claimant and decedent were not parent and child; rather claimant was married to a grandson of decedent, a relationship too remote to justify implying that claimant's services were rendered as a filial duty.

Secondly, objector attempts to substantiate his conclusion that a family relationship existed by pointing out that claimant visited decedent's household frequently, that she ate many meals there and occasionally spent the night there, and was, in effect, practically a member of the family. However, it must be remembered that the performance of her services was primarily responsible for the very presence of claimant in the household and necessitated her eating meals and sleeping there and using the house as a base for her son's school activities. In short, although claimant participated to a limited extent in the family life of decedent prior to his illness, it was the very performance of her services to decedent that drew her daily routine into closer contact with decedent's family life, and it would be unfair and unrealistic to construe this relationship between claimant and decedent as a bar to recovery on her claim.

Objector further argues that Evelyn's claim is barred by the presumption against periodic payments. This presumption has been defined as follows:

"The payment of wages for domestic services and payment of board are presumed to be made at stated periods, and where suit is brought against the decedent's estate, and the plaintiff offers no affirmative evidence nor proves any circumstance to rebut the

presumption that payment was made, a verdict should be directed for defendant": Hart v. Drumm, 55 Pa. Superior Ct. 457, 460.

In the present case, the presumption has been effectively rebutted by decedent's acknowledgment to his executor that these services were not paid for. The depositions at page 10 read as follows:

"Q. Did he [decedent] ever say anything to you concerning any remuneration for Evelyn Binder?

"A. [Reply of executor] Yes, he did, more than once; but he never went into what she should have. But he told me to see that she got paid for the work she did for him."

At page 11 the executor made this additional statement:

"Q. Did your father ever tell you whether he, during his lifetime, had made any payment to William Binder or Evelyn Binder for the things they had done for him?

"A. No, he didn't. If he did, he would have told me."

Objector has pointed out that the claim runs for a period of four days after the date of death of decedent. Testimony was submitted to the effect that claimant continued to render certain cleaning services until the funeral of decedent which was held in decedent's residence four days after his death. However, these services obviously cannot fall within the category described in the statement of claim as "washing, giving medicine, changing diapers, helping in and out of bed, preparing and serving meals," and in the absence of more positive definition, description and proof this portion of the claim must be disallowed.

It has been stipulated by counsel for objector and claimant that $8 per day represents the average cost in this area for the type of services rendered by Evelyn Binder, the dispute being confined solely to the question of liability.

In conclusion, the claim of Evelyn Binder is hereby allowed, as a preferred debt, to the extent of $768 and objections nos. 3 and 4 are dismissed. The executor having already taken a credit of $800 for this claim, he is hereby surcharged in the amount of $32.

The claim of William, son-in-law of decedent, as detailed above, encompasses $79.77 of bills allegedly paid for decedent, and $7,080 for office rent, room and board, washing and ironing from 1946 to date of death, and practical nursing services from January 1, 1949, also to date of death.

Preliminarily, claimant has raised a procedural argument seeking dismissal of the objections to the allowance of this claim. He contends that the objections specifically relate only to the absence in the account of the dates on which the specific services were rendered and the relationship between claimant and decedent. However, the whole proceeding has been to contest the basic validity of these claims; it would be unjust to ignore the substance of the main question on the basis of this technical procedural nicety.

With regard to the $7,080 portion of the claim, as in the case of Evelyn, it is clear that decedent never expressly agreed to pay for any of these services. At most, decedent's expressions on the subject were made long after the performance of the bulk of the alleged services, were couched in vague and general terms which cannot be construed to constitute an express promise to pay for any particular service or indebtedness, and are not sufficient to establish an express contract. For example, William testified at the audit that decedent, ". . . off and on, in his conversations, he would tell other people that those who took care of him were to be paid for the services that they give him, and his care, when he became such that he needed care"; and William further testified that two days before decedent's death, decedent stated to him, in

the presence of Evelyn and Mazie Binder: "Bill," he says, "I didn't fix up with you people, but, if you have any claims of any bills to be paid, present them to Raymond. He is the executor of my estate." Decedent had also told his executor, two or three months prior to his death that William and his wife Mazie had performed services for him, and said they should be paid but he never specified the particular services that were to be paid for, nor the rate of compensation.

Nor is the testimony definite enough to establish an implied contract to pay. True, the son-in-law relationship is not sufficient in itself to establish the family relationship which in turn would raise a presumption of gift. See Gerz v. Demarra, 162 Pa. 530; Bergstresser Estate, 107 Pa. Superior Ct. 436. In the present case, however, claimant has conceded that many of the services contemplated in his claim were rendered not by him, but by his wife, the daughter of decedent. Her relationship to decedent is one of parent and child, and it is clear that in this circumstance the law presumes, in absence of an express contract to the contrary, that services rendered by members of the family to one another are performed without expectation of remuneration: Gibb's Estate, supra.

It is apparent, then, that the portion of the claim representing services performed by decedent's daughter must be dismissed, and it follows necessarily that the son-in-law's claim must also be denied, for no basis exists for segregating the claims of these two individuals, that is for determining exactly what services were performed by William and for placing a reasonably accurate valuation thereon. William undoubtedly has unselfishly performed an onerous and unpleasant task, and it is extremely regrettable that no definite agreement was made between him and decedent to compensate him for this humane service. However, the law must necessarily be strict with regard to

claims against a decedent's estate, and although claimant has done commendable work, his claim has not been established with the precision required by our cases.

"We have said many times that claims of this nature must be subjected to the closest scrutiny, being objects of just suspicion [citing], and must be established by evidence 'clear, precise and indubitable' ": Mooney's Estate, 328 Pa. 273, 274. Therefore this portion of the claim must be denied, the objection to allowance thereof sustained and the executor, having taken credit for $7,080 in his accounting, is surcharged accordingly.

In addition to the above, William has also submitted a claim for $21.63 covering the costs of certain medical supplies. This portion of the claim has not been disputed and is hereby allowed as a preferred debt.

A third item of $50 is claimed for remuneration of expenses incurred on the day of the funeral in providing both labor and food for the mourners. As noted above, the funeral was held from the home of claimant William. There is ample precedent for allowing the expense of entertaining mourners as an appropriate item of funeral expense, even in an insolvent estate: See Gumienny's Estate, 1 Lawrence 64; Kraan's Estate, 14 Dist. R. 136, and Reeves Estate, 12 Luz. 137. This claim therefore is also allowed as a preferred debt.

The final item is for a telephone bill of $8.14. The telephone was registered in the name of decedent, and this item is appropriately considered one of his debts, and is hereby allowed.

The debts due the RFC have rendered this estate hopelessly insolvent. Accordingly, accountant is limited to $400 for funeral expenses (Anhorn Estate, 6

D. & C. 2d 54), and having taken credit for $829.13, accountant is hereby surcharged for the difference.

Out of the net ascertained balance for distribution the preferred claims, as herein allowed, are awarded, and the balance then remaining is awarded pro rata to the general creditors. . . .

And now, October 31, 1957, this adjudication is confirmed nisi.